**PUBLIC COUNSEL**
Amanda Mangaser Savage (325996)
*asavage@publiccounsel.org*
Ritu Mahajan (252970)
*rmahajan@publiccounsel.org*
Katrina Landeta (361200)
*klandeta@publiccounsel.org*
Cassidy Bennett (347811)
*cbennett@publiccounsel.org*
Kaho Maeda (364273)
*kmaeda@publiccounsel.org*
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: 213.385.2977

*[See additional counsel on next page]*

Attorneys for Plaintiffs M.P.; M.R.; J.L.; Union de Vecinos; People Organized for Westside Renewal (POWER)

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| M.P.; M.R.; J.L.; PEOPLE ORGANIZED FOR WESTSIDE RENEWAL (POWER); UNION DE VECINOS,<br><br>Plaintiffs,<br><br>v.<br><br>SCOTT TURNER, in his official capacity as Secretary, U.S. Department of Housing and Urban Development; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,<br><br>Defendants. | Case No. 2:26-cv-13392<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

*Additional counsel continued from first page*

**KENDALL BRILL & KELLY LLP**
Richard B. Kendall (90072)
*rkendall@kbkfirm.com*
Nary Kim (293639)
*nkim@kbkfirm.com*
Daniel Barlava (334910)
*dbarlava@kbkfirm.com*
David A. Alpert (343840)
*dalpert@kbkfirm.com*
10100 Santa Monica Blvd., Suite 2500
Los Angeles, California 90067
Telephone: 310.556.2700
Facsimile: 310.556.2705

**BIRD, MARELLA, RHOW, LINCENBERG, DROOKS & NESSIM, LLP**
Michael C. Landman (343327)
*mlandman@birdmarella.com*
Alexander H. Tran (338940)
*atran@birdmarella.com*
Monique M. Candiff (340315)
*mcandiff@birdmarella.com*
Abigail M. Smith (356756)
*asmith@birdmarella.com*
1875 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: 310.201.2100

Attorneys for Plaintiffs M.P.; M.R.; J.L.; Union de Vecinos; People Organized for Westside Renewal (POWER)

## INTRODUCTION

1. For more than 30 years, the U.S. Department of Housing and Urban Development ("HUD") has allowed mixed-status families to remain together while receiving federal housing assistance.[1] But in a radical departure from this longstanding practice, HUD is now forcing these families either to separate or lose that assistance. Under the agency's new rule, a U.S.-citizen child can lose her home because her parent lacks eligible immigration status—even though the child herself is fully eligible for federal housing assistance.

2. Published on November 12, 2026 and titled "Housing and Community Development Act of 1980: Verification of Eligible Status," HUD's final rule (the "Rule") rewrites its regulations implementing Section 214 of the Housing and Community Development Act of 1980, codified at 42 U.S.C. § 1436a ("Section 214"). The Rule takes effect on December 14, 2026. For decades, HUD provided mixed-status families with assistance based only on the number of eligible family members ("prorated assistance"). No assistance has been allocated to family members who have not established eligibility, but the family has been allowed to remain together. The Rule dismantles this protection, requiring every applicant and recipient to verify U.S. citizenship or eligible immigration status,[2] and generally eliminating ongoing prorated assistance for families whose members cannot all establish eligibility. As a result, tens of thousands of people who are themselves fully eligible for federal housing assistance are at risk of losing it. Indeed, the Rule will primarily affect U.S. citizens, who comprise approximately two-thirds of the people living in affected mixed-status households.[3]

---

[1] In mixed-status families, at least one family member has U.S. citizenship or eligible immigration status and at least one family member does not.

[2] "Eligible immigration status" is defined further *infra* ¶ 27.

[3] Erik Gartland & Sonya Acosta, *Administration Plan Targeting Immigrants Would*

3. Since 1995, HUD's "do not contend" provision has allowed family members to decline to verify their immigration status and continue to live in HUD-assisted housing with their family without receiving any assistance themselves. This protection has helped mixed-status families remain together and maintain stable housing. For three decades, families have relied on this policy in making decisions about their housing, employment, schooling, caregiving, and finances. Public Housing Agencies ("PHAs"), in turn, have structured their budgets and operations around the rents and subsidies generated by prorated assistance.

4. When an agency abandons a longstanding policy, the Administrative Procedure Act requires it to take account of serious reliance interests engendered by the prior regime. The agency must assess whether such reliance interests exist, determine whether they are significant, and weigh them against competing policy concerns. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–33 (2020); *See* also *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–24 (2016). It must also consider the consequences of its action and reasonable alternatives. *Regents*, 591 U.S. at 25–26, 30–33.

5. HUD did nothing of the sort. Its own analysis shows that the Rule will increase costs while reducing the number of households receiving assistance; put approximately 36,000 children who are themselves eligible for federal housing assistance, including U.S. citizens, at risk of displacement; and destabilize families that have relied on that assistance for decades. PHAs will face substantial new verification, termination, and turnover costs, while families will face displacement, school disruption, family separation, and potential homelessness. For children, the harm can begin long before displacement. The threat of losing a home introduces

---

*Take Away Rental Assistance, Create New Barriers*, Ctr. on Budget & Pol'y Priorities tbl. 1 (Dec. 12, 2025), https://www.cbpp.org/research/housing/administration-plan-targeting-immigrants-would-take-away-rental-assistance-create.

uncertainty and stress into daily life, while displacement can disrupt the routines, relationships, and sense of security that support healthy emotional and cognitive development. Yet HUD failed to grapple adequately with those consequences.

6. These failures are especially stark because Congress already weighed the interests that HUD now invokes, choosing to limit federal housing assistance to eligible individuals while preserving mixed-status families through prorated assistance. Section 214 requires prorated assistance when at least one family member is eligible and no other member has been affirmatively determined ineligible, and separately provides family-preservation assistance for certain mixed-status families. Congress adopted that framework after rejecting an earlier HUD proposal that would have imposed similar household-wide consequences. The Rule thus does not merely reflect a different policy judgment; it contravenes the accommodation Congress enacted.

7. For affected families, the consequences are immediate and concrete. If a family cannot or will not submit documentation for every family member—regardless of whether the household includes U.S. citizens—HUD will terminate its housing assistance entirely. Many families will face displacement from homes they have occupied for years, even decades, into a housing market they cannot afford. In Los Angeles County, there is a shortage of approximately 486,000 affordable homes for lower-income renter households.[4][5] Plaintiff M.R. is a U.S. citizen with cerebral palsy

---

[4] Sarah Mahin, Dir., L.A. Cnty. Dep't of Homeless Servs. & Hous., *Ninth Annual Affordable Housing Outcomes Report* 2 (Feb. 20, 2026), https://file.lacounty.gov/SDSInter/bos/bc/1202643_NinthAnnualAffordableHousingOutcomesReport-BoardMemo.pdf.

[5] *Fair Market Rents for the Housing Choice Voucher Program, Moderate Rehabilitation Single Room Occupancy Program, and Other Programs, Fiscal Year 2027*, 91 Fed. Reg. 56,156 (Sept. 1, 2026); U.S. Dep't of Hous. & Urb. Dev. [hereinafter HUD], *FY 2027 Schedule of Metropolitan & Non-Metropolitan Fair Market Rents* 4 (2026),

who has lived in public housing since he was one year old. Under the Rule, he and his family, on whom he depends for care, will be forced to seek housing in a market they cannot afford without federal assistance. The Rule threatens to deprive M.R. of his home and the stability it provides.

8. This Rule arrives amid an unprecedented housing affordability crisis. The United States already faces a severe shortage of affordable housing for low-income renters,[6] and homelessness remains extraordinarily high, especially in Los Angeles.[7] The Rule will exacerbate this crisis, forcing thousands of families out of subsidized housing and into a market with few (if any) alternatives they can afford.

9. Despite that obvious risk, HUD failed to meaningfully analyze the predictable consequences of terminating assistance to families unable to afford market-rate housing. Nor did HUD adequately consider the harms to children from housing insecurity and prolonged uncertainty, even when families avoid homelessness. HUD also rejected an alternative identified in its own Regulatory Impact Analysis ("RIA"): allowing existing mixed-status families to remain under the prior rules while applying the new requirements only to future applicants. HUD conceded that this "grandfathering" of existing families "would fulfill the objectives of the rule while avoiding the transition costs borne by mixed families," yet rejected it because it would take longer to transfer assistance to other households. 91 Fed. Reg. at 73023. But accelerating that transfer does not justify imposing the transition costs and risk of displacement that grandfathering would avoid.

---

https://www.huduser.gov/portal/datasets/fmr/fmr2027/FY2027_FMR_Schedule.pdf.

[6] *The Gap: A Shortage of Affordable Homes*, Nat'l Low Income Hous. Coal., https://nlihc.org/gap (last visited Oct. 20, 2026).

[7] Christian Hetrick, *Report: L.A. Housing Demand Increases Despite Population Declines*, USC Price Sch. of Pub. Pol'y (Aug. 21, 2025), https://priceschool.usc.edu/news/los-angeles-la-housing-crisis-data-homelessness/.

10. HUD's Rule violates the Administrative Procedure Act, the Fair Housing Act, and the U.S. Constitution. Plaintiffs bring this action for declaratory and injunctive relief to vacate the Rule under the Administrative Procedure Act.

**JURISDICTION AND VENUE**

11. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law, including the U.S. Constitution and the Administrative Procedure Act. Defendants do not have sovereign immunity for purposes of this action. *See* 5 U.S.C. § 702.

12. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02 and the Court's inherent equitable powers.

13. Venue properly lies in the Central District of California pursuant to 28 U.S.C. § 1391(e)(1). All Defendants are agencies, or officers of agencies, of the United States, and at least one Plaintiff resides in this District.

**PARTIES**

14. **Plaintiff J.L.** is a resident of Los Angeles County whose household currently receives HUD assistance. J.L. lives with her mother, stepfather, and two brothers. J.L. and her two brothers are U.S. citizens, but her parents do not have HUD-eligible immigration statuses. Under the Rule, J.L. and her family, who have lived in public housing for the past fifteen years, will face the loss of all housing assistance or be forced to separate. Setting aside the Rule would allow J.L.'s household to continue receiving housing assistance under the existing framework.

15. **Plaintiff M.P.** and her husband, both over 62, are naturalized U.S. citizens in Los Angeles County whose household receives HUD assistance. The Rule requires them, for the first time, to submit a verification consent form, undergo U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements ("SAVE") verification, and, if SAVE does not confirm their citizenship, produce

secondary documentation such as a naturalization certificate. As elderly naturalized citizens, M.P. and her husband face a concrete risk that the Rule's new verification system will disrupt or terminate the housing assistance on which they depend.

16. **Plaintiff M.R.**, a U.S. citizen with cerebral palsy, lives in Los Angeles County with his mother, his father, and his sister, a DACA recipient. The household receives HUD assistance as a mixed-status family, and M.R. depends on his parents and sister for support. Under the Rule, his parents and sister will be unable to establish eligible immigration status. *See* U.S. Dep't of Hous. & Urb. Dev., Citizenship and Immigration Status Verification, app. A at 8 (Dec. 16, 2025) (classifying "Deferred Action for Childhood Arrivals (DACA) – Employment Authorized" as "Ineligible for HUD Assistance"). The family therefore faces the loss of all housing assistance or separation of the relatives who provide M.R.'s care.

17. Plaintiffs J.L., M.P., and M.R. are referred to collectively as "Individual Plaintiffs."

18. **Plaintiff People Organized for Westside Renewal (POWER)** is a membership-based community organizing group that advocates for subsidized housing in public housing developments in Los Angeles. Founded in 1999 by tenants of HUD-assisted housing, POWER currently organizes in three Housing Authority of the City of Los Angeles ("HACLA") public housing developments—Mar Vista Gardens, San Fernando Gardens, and William Mead Homes—and 15 project-based Section 8 buildings in Venice. POWER's members include public-housing tenants, low-income tenants, and mixed-status families, including families who receive HUD-assisted housing. POWER currently has approximately 80 members, including approximately 65 who reside in HUD-assisted housing. Approximately 50 to 65 members participate actively and regularly, and approximately one-quarter live in mixed-status households receiving prorated HUD assistance. POWER selects members to participate in its Leadership Training program, which teaches participants how to organize, build a base of support in their neighborhood, and provide the

resources required for successful campaigns. POWER employs a grassroots organizing strategy grounded in relationship building and direct action to create meaningful change for its members and their communities. POWER's members participate in meetings, Know-Your-Rights trainings, tenant campaigns, food-pantry operations, and leadership development. One of POWER's key pillars is the right to housing, which it advances through its eviction prevention fund. This fund is used to provide emergency assistance to members who fall behind on rent. POWER carries out these activities through its six paid staff members, including four organizers, working together with member leaders and volunteers. POWER's interests in the outcome of this litigation are germane to its member-driven housing mission. POWER is a membership organization, not merely an advocacy group: Individuals become members through active participation in POWER's meetings, campaigns, and programs. Members identify issues affecting their communities at meetings within each housing development and collectively decide which campaigns POWER will pursue. Members also develop and select POWER's leaders, including a core group of approximately 15 to 20 member leaders who carry out much of its day-to-day organizing work. POWER's members thus possess the indicia of membership and direct its activities.

19. **Plaintiff Union de Vecinos** is a membership-based tenant and community organizing group in the Boyle Heights neighborhood of Los Angeles and the Eastside Local of the Los Angeles Tenants Union. Public housing residents of the Pico Aliso development founded Union de Vecinos as a member-led organization in 1996 to oppose HUD's proposed demolition of their homes, and it has organized public-housing and low-income tenants for nearly thirty years. Union de Vecinos is a membership organization, not merely an advocacy group: its work is always determined by its neighborhood committees and tenant associations, and its structure ensures that the members most affected by housing conditions direct and decide the work in which the organization engages. Individuals become members through active

participation in neighborhood committees, tenant associations, and organizational programs. Members are asked to contribute dues, generally between $1 and $5 per month or whatever they can afford, but no one is excluded for inability to pay. Members identify issues affecting their buildings and neighborhoods through neighborhood committees, which determine Union de Vecinos's priorities and campaigns. The organization recognizes different levels of membership based on participation and responsibility, including approximately 82 base members who participate regularly in committee activities, 17 leaders who support committees and campaigns across neighborhoods, and ten volunteer organizers who oversee its day-to-day operations. Leaders and organizers develop through sustained participation and service to the organization. Of its approximately 363 members, around 20 percent live in HUD-assisted housing, and approximately 30 percent of its leaders reside in public housing.

20. Union de Vecinos does not track members' immigration status, but some of its members live in mixed-status households receiving prorated HUD assistance, including the household of A.H., which faces the loss of housing assistance or forced family separation under the Rule. Union de Vecinos's members organize through neighborhood committees and tenant associations, block meetings, door-to-door outreach, and campaigns against displacement. Union de Vecinos has long operated neighborhood committees, eviction-prevention and hearing-support programs, Know-Your-Rights clinics, and food distributions serving approximately 120 families every two weeks. Those programs depend on members from mixed-status households who serve as organizers, neighborhood leaders, and volunteers and cannot readily be replaced because of their longstanding relationships and community-specific knowledge. If those members are displaced or separated from their families, Union de Vecinos will lose the leadership and volunteer capacity necessary to carry out its established programs. These are concrete impairments to Union de Vecinos's preexisting operations, not injuries based on its opposition to the Rule or resources

voluntarily spent advocating against it. Union de Vecinos's interests in the outcome of this litigation are thus germane to its member-driven mission of preventing the displacement of public-housing and low-income tenants, and its members thus possess the indicia of membership and direct its activities.

21. Plaintiffs POWER and Union de Vecinos are referred to collectively here as "Organizational Plaintiffs."

22. **Defendant Scott Turner** is the Secretary of HUD, which is responsible for administering federal aid to local housing authorities pursuant to 42 U.S.C. § 3531 et seq. Defendant Turner is sued in his official capacity.

23. **Defendant U.S. Department of Housing and Urban Development (HUD)** is a federal executive agency responsible for, among other things, administering federal programs that provide housing assistance.

## BACKGROUND

24. To build homes that low-income families could afford, Congress established HUD's public housing program in 1937 through the U.S. Housing Act. While primarily funded by the federal government, public housing sites are owned and operated by local PHAs.

25. Congress later established the Section 8 program to expand the low-income housing supply. Section 8 today comprises multiple programs, including Tenant-Based Section 8 Housing Choice Vouchers and Project-Based Section 8 programs. Tenant-based vouchers provide portable rental subsidies that tenants may use on the private market, while project-based assistance is tied to a particular housing unit.

26. Across all of these programs, demand outweighs supply. HUD's housing programs are oversubscribed and depend on continued federal funding. It is against this backdrop of scarce resources that the Rule threatens to strip assistance from families who have waited years for the housing they now occupy.

## I. Section 214's Framework for Mixed-Status Families

27. Section 214 of the Housing and Community Development Act of 1980, as amended and codified at 42 U.S.C. § 1436a ("Section 214"), limits federal housing assistance to U.S. citizens and noncitizens with specified eligible immigration statuses, including lawful permanent residents, refugees, asylees, and certain parolees. 42 U.S.C. § 1436a(a); 24 C.F.R. § 5.506(a).

28. In 1988, Congress enacted the Housing and Community Development Act of 1987, which amended Section 214 to include a "Preservation of Families" section allowing the "continued provision of financial assistance, if necessary to avoid the division of a family" in specified circumstances. Pub. L. No. 100–242, Feb. 5, 1988, 101 Stat. 1815.

29. In 1996, Congress amended Section 214 to introduce prorated assistance, which, as now codified at 42 U.S.C. § 1436a(b)(2), provides:

> If the eligibility for financial assistance of at least one member of a family has been affirmatively established under the program of financial assistance and under this section, and the ineligibility of one or more family members has not been affirmatively established under this section, any financial assistance made available to that family by the applicable Secretary shall be prorated, based on the number of individuals in the family for whom eligibility has been affirmatively established under the program of financial assistance and under this section, as compared with the total number of individuals who are members of the family.

30. To be eligible for public housing, a household must have at least one member who is a U.S. citizen or has eligible immigration status. A minor child may be the household member with eligible immigration status.

31. Congress's family-preservation provisions and proration requirement permit mixed-status families to receive reduced assistance in specified circumstances rather than necessarily losing assistance for the entire household. Because assistance is prorated based on the number of eligible family members, mixed-status families can pay substantially more toward rent than fully eligible households.

32. To administer this framework, current regulations require each family

member applying for assistance to either submit a declaration of U.S. citizenship or eligible immigration status, or elect to "not contend" eligible immigration status. For noncitizens age 62 or older, the regulations require a declaration of eligible immigration status and proof of age, but do not require the additional immigration-status documentation and SAVE verification required of younger noncitizens.

## II. The Rule Alters HUD's Longstanding Framework for Mixed-Status Families

33. The Rule fundamentally alters Section 214's immigration-status verification requirements. Most significantly, the Rule eliminates the longstanding "do not contend" provision. Under current regulations, family members may elect to "not contend" eligible immigration status, meaning they decline to claim eligible status without submitting to verification. Such members are treated as ineligible for purposes of proration, but their ineligibility has not been "affirmatively established under this section" within the meaning of Section 1436a(b)(2). By eliminating this option and requiring every family member to undergo verification, HUD takes the position that an affirmative determination of ineligibility will remove the entire family from the proration provision's scope. Indeed, HUD expressly acknowledges that eliminating the "do not contend" option renders Congress's proration provision "temporary." 91 Fed. Reg. at 73016–17.

34. The Rule also expands verification requirements. Under current regulations, noncitizens age 62 or older are not subject to the same documentary and SAVE verification requirements that apply to younger noncitizens. The Rule eliminates that exemption and requires all family members, including U.S. citizens, to verify their citizenship or eligible immigration status. PHAs and private building owners will verify family members' eligibility through the SAVE program.

35. The Rule, which takes effect December 14, 2026, constitutes final agency action reviewable under the Administrative Procedure Act and for which no other adequate court remedy exists. *See* 5 U.S.C. § 704. By January 11, 2027,

responsible entities must notify tenants who have not submitted the required evidence of eligible status. Tenants in mixed-status families must submit that evidence within 90 days of the Rule's effective date, subject to extensions of up to 60 days. 24 C.F.R. § 5.508(e)(1)(ii), (f)(2)(i), (g)(2) (as amended); 91 Fed. Reg. at 72978, 73027–28.

## FACTUAL ALLEGATIONS

### I. HUD Ignores the Reliance Interests and Administrative Consequences Created by Thirty Years of Settled Policy

36. According to HUD's September 30, 2025 RIA, approximately 8.9 million people lived in HUD-assisted housing as of December 2024. U.S. Dep't of Hous. & Urban Dev., Regulatory Impact Analysis, Housing and Community Development Act of 1980: Verification of Eligibility Status, at 9 (Sept. 30, 2025). Of those, 79,300—less than one percent—lived in what HUD calls "Mixed Families" (hereinafter "mixed-status families"), households in which at least one member is eligible for HUD assistance and at least one is not. *Id*. Of the 79,300 people living in mixed-status families, approximately 55,100 are eligible for HUD assistance, including approximately 36,000 children. *Id.* at 8–9. The remaining 24,100 people are ineligible for assistance, representing just 0.27 percent of all people living in HUD-assisted housing. *Id*. at 9.

37. For decades, mixed-status families like those reflected in HUD's analysis have organized their lives around the availability of prorated assistance. They enrolled their children in local schools, developed local community support networks, and sought and maintained employment close to where they lived. As one public commenter notes:

> I am confined to a wheelchair and reside in an accessible unit specifically designed and assigned for individuals with disabilities. My daily survival, health, and ability to live independently depend entirely on the constant, around-the-clock care provided by my wife, who is my sole caregiver. She assists with all essential activities of daily living, including mobility, medication management, personal hygiene, and emergency response. Without her, I would face immediate risk of institutionalization, severe health decline, or life-threatening homelessness.

> While my wife currently lacks legal immigration status, she is an irreplaceable part of my support system.

Public Comment, mmm-7y5u-w9bn.

38. Another public commenter notes that the Rule "ignores the critical role many grandparents play in providing unpaid childcare, as well as the role adult children play in caring for their aging parents and relatives." Public Comment, mmt-7ruz-leur.

39. The threat of losing housing assistance has already disrupted longstanding family and community relationships. V.M., a longtime POWER member, lived at Mar Vista Gardens from 2007 until June 2026, raising her children in the same public-housing community for nearly twenty years. After HUD proposed the Rule in February 2026, her three adult children, including two DACA recipients who lack eligible immigration status for HUD assistance, moved out rather than wait for their family's housing assistance to be terminated. They relocated to Encino, leaving the neighborhood where they had grown up and increasing their commutes to work. V.M.'s subsequent departure also deprived one of her daughters of childcare she had provided, causing her daughter to lose income. V.M., her husband, and their youngest daughter subsequently moved to Mexico. The family's separation deprived its members of longstanding support networks and deprived POWER of V.M. and other members of her family who had participated in its organizing work.

40. In addition to failing to justify its policy reversal, the Rule fails to adequately consider the reliance interests that thousands of U.S. citizens living in mixed-status households have developed over decades. HUD acknowledged these reliance interests but failed to meaningfully weigh them against the consequences of abandoning the longstanding policy. Nor did HUD adequately address public comments concerning the impact that the Rule would have on: (a) U.S. citizens who rely on undocumented family members to be the caregivers of children and elderly or disabled adults; (b) U.S.-citizen children who would suffer from housing and

educational instability as a result of having to relocate; and (c) PHAs that have structured their budgets and operations on the ability to provide prorated assistance to mixed-status households.

41. HUD's own analysis also shows that the Rule will result in fewer households receiving assistance overall. Following the 1996 Rule, PHAs structured their budgets and operations around rental income generated by mixed-status households paying prorated rents. By providing only prorated assistance to mixed-status families, PHAs were able to use their remaining HUD funds to assist other HUD-eligible individuals.

42. Because PHAs operate with finite HUD funding, the amount of assistance each household requires affects the overall number of households a PHA can serve. Replacing mixed-status households with fully eligible households requires PHAs to pay larger subsidies per household in both public housing and Section 8 voucher programs, leaving fewer resources available to assist other families.

43. Consistent with this result, HUD's own RIA states that the "primary effect [of the Rule] would be to assist proportionally fewer households and household members." RIA at 17. The RIA further estimates that removing mixed-status families would reduce tenant rent payments by approximately $2,100 per family annually. RIA at 15. This is because, among other things, mixed-status families pay proportionally more rent and receive significantly lower subsidies on a per-person and per-household basis. According to the RIA, the Rule would nearly triple the average annual per-person subsidy. RIA at 16. Even excluding ineligible family members from the calculation, the Rule would nearly double the average annual per-person subsidy: members of mixed-status families receive, on average, $3,885.84 per person, whereas members of fully eligible households receive, on average, $7,700 per person. The RIA cautions that, because replacement households require higher subsidies, "[a]bsent an increase in appropriations for all covered programs, fewer households would receive housing assistance." *Id.* at 5. HUD confirms that the Rule "may result in a reduction

in the number of households and eligible individuals receiving assistance." 91 Fed. Reg. at 72991, and acknowledges that an increase in its overall budget is "unlikely," *id*. at 73000.

44. Moreover, implementation of the Rule will impose significant administrative costs and burdens. As one commenter notes, the Rule would impose "substantial administrative costs" on PHAs, whose employees are not trained to determine immigration status, including the costs of "implementing the mandatory SAVE verification for all household members across all housing programs" and "processing terminations, handling appeals, and managing unit turnover." Public Comment, mms-5nr7-1ve1. The Rule would also impose "downstream costs [on] states, counties, and cities that will absorb the surge in emergency shelter demand, child welfare cases, and other safety-net services when households are displaced." *Id*. HUD's own RIA likewise estimates that the total costs borne by responsible entities and HUD-eligible tenants and applicants as a result of the Rule will range from $17 million to $33 million. RIA at 33.

45. Private landlords participating in the Section 8 voucher program will likewise bear the cost of enforcing the Rule if households do not comply. Where a household's assistance is terminated but the household does not voluntarily vacate, landlords will incur eviction-related legal costs and lose rent revenue. These costs may discourage private landlords from participating in the Section 8 voucher program, further limiting the availability of assisted housing.

46. The Congressional Research Service's analysis of materially similar proposed changes likewise concluded that they would "increase subsidy costs by roughly $200 million annually," and impose additional administrative costs on HUD and the PHAs administering HUD assistance. By 2026, the estimate is even higher. The RIA estimates that Congress would need to provide the PHAs with between $311 million and $385 million in additional funds in order to provide the same level of assistance. RIA at 19. And if Congress chooses not to do so, PHAs will be forced to

leave available housing units vacant, reduce overall project expenses, or do a combination of both. RIA at 18. The result would be either less housing stock or lower quality housing stock.

47. The RIA identifies approximately 36,000 HUD-eligible children living in mixed-status households affected by the Rule. RIA at 8. Yet HUD fails to explain how the anticipated benefits of removing approximately 24,000 ineligible family members—less than one-half of one percent of HUD-assisted residents—justify the costs imposed on PHAs and eligible family members, including those children.

48. For more than thirty years, HUD has administered Section 214 through a framework that permits mixed-status families to remain housed together while receiving prorated assistance. During that time, families have organized their housing, employment, schooling, caregiving, and finances around the availability of prorated assistance. PHAs likewise have structured their budgets and operations around that framework.

## II. Congress Enacted a Framework to Preserve Mixed-Status Families

49. Section 214 reflects Congress's decision to limit federal housing assistance to eligible individuals while preserving mixed-status families through prorated assistance. Section 214 requires prorated assistance when at least one family member is eligible and no other member has been affirmatively determined ineligible, and separately provides family-preservation assistance for certain mixed-status families.

50. The statute's structure reinforces Congress's decision to preserve prorated assistance for mixed-status families. Both Sections 1436a(b)(2) and (c)(1)(A) permit proration in specified circumstances. In contrast, Section 1436a(c)(1)(B), which allows an agency to "defer the termination of financial assistance" to permit an orderly transition to other affordable housing, carries an express time limit: deferral is available only for renewable six-month periods up to an aggregate of eighteen months.

51. Congress's decision to impose a time limit in Section 1436a(c)(1)(B) while omitting any time limit from the neighboring proration provisions in Sections 1436a(b)(2) and (c)(1)(A) was deliberate; where Congress includes particular language in one section of a statute but omits it from a neighboring section addressing the same subject matter, the omission is presumed intentional.

52. HUD's own implementing regulations confirm this structure. 24 C.F.R. § 5.516 identifies continued assistance, temporary deferral of assistance termination, and prorated assistance as three distinct forms of preservation assistance for mixed-status families. 24 C.F.R. § 5.518(b)(1) provides that temporary deferral is available only when a mixed-status family either qualifies for prorated assistance but declines it, or has no members with eligible immigration status.

53. Section 1436a(d)(6) provides further confirmation of Congress's intent. That provision mandates a 24-month minimum period of family-wide ineligibility where someone "knowingly permits an ineligible individual to reside" in the assisted unit, but it expressly exempts families where "the ineligibility of the ineligible individual at issue was considered in calculating any proration of assistance provided for the family." Congress thus created a statutory safe harbor for households openly containing an ineligible person, so long as the proration calculation accounts for that person's ineligibility.

54. Section 1436a(d)(6) also demonstrates that Congress knew how to impose household-wide consequences when it wished to do so, and chose to do so only for culpable conduct. That provision imposes family-wide termination for "knowing[ly]" permitting an ineligible individual to reside in a unit, but only where the family fails to account for that individual through proration. By contrast, Section 1436a(b)(2) addresses mixed-status families through proration rather than automatic household-wide termination.

55. The statutory text reflects Congress's rejection of an earlier HUD proposal that would have imposed similar household-wide consequences. Following

passage of the Immigration Reform and Control Act of 1986, HUD proposed implementing regulations that would have required every household member, regardless of age or citizenship, to document eligible status or face termination of the family's entire housing assistance, with no proration mechanism. The House Committee on Banking, Finance and Urban Affairs found that this approach would produce "extraordinary hardships, excessive paperwork and unnecessary financial difficulties," including the mandatory eviction of thousands of families, the eviction of citizens and properly documented residents because other household members could not meet documentation requirements, and the denial of admission to otherwise-eligible families. H.R. Rep. No. 100-122(I) (1987).

56. Congress responded by enacting the Housing and Community Development Act ("HCDA"), which added Section 214's family-preservation provisions. Congress subsequently strengthened that framework in 1996 by adding the mandatory proration requirement now codified at Section 1436a(b)(2).

57. On March 20, 1995, after over a decade of attempts to promulgate a rule implementing Section 214, HUD promulgated a Final Rule that became effective on June 19, 1995 ("1995 Final Rule"). On March 27, 1996, HUD further streamlined those regulations and renumbered them to the C.F.R. sections in place today (the "Prior Rule"). The Prior Rule implemented Section 214 through a framework that included prorated assistance, temporary deferral of termination, the "do not contend" option, and streamlined verification requirements for individuals aged 62 and older.

58. Regarding its decision to offer prorated assistance to mixed-status families, HUD stated that "[p]roration of assistance is consistent with the preservation of Families provisions of Section 214, which provide for continued assistance and temporary deferral of termination of assistance." 60 Fed. Reg. 14822. HUD further stated that the preservation provisions "reflect the concern of the Congress about displacement, or immediate displacement of families, who but for their immigration status, were eligible to reside in public housing or assisted housing," and "flow

directly from the statute." 60 Fed. Reg. 14820–21.

59. Regarding the Prior Rule's effect on mixed-status families overall, HUD noted that the Rule "strives to maintain the unity of the family under the regulatory provisions concerning special assistance to mixed families." 60 Fed. Reg. 14823.

60. The repeal of the Prior Rule is based on a factual record that has not materially changed since the Prior Rule was adopted. The Rule does not adequately explain why HUD has abandoned the positions reflected in the 1995 Final Rule concerning family preservation, continued prorated assistance, the unity of mixed-status families, and the verification requirements applicable to individuals aged 62 and older.

**III. HUD Has No Authority to Rewrite Congress's Statutory Framework**

61. Section 214 delegates to HUD authority to verify eligibility and administer prorated and preservation assistance consistent with the statute's text. It does not authorize HUD to convert prorated assistance into a time-limited status or to expand verification obligations beyond what Congress specified. *See* 42 U.S.C. § 1436a.

62. By converting prorated assistance into a merely "temporary condition" that terminates absent verification of every family member's citizenship or eligible immigration status, the Rule alters the statutory framework Congress enacted rather than merely administering it.

63. The post-*Loper Bright* framework confirms that HUD's interpretation cannot stand. Courts must exercise "independent judgment" about questions of statutory interpretation, applying the traditional tools of statutory construction—including text, structure, context, and history—to identify the best reading of the statute rather than asking merely whether the agency's reading is permissible. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–12 (2024).

64. The Rule treats mixed-status families as subject to household-wide

consequences even where the family has complied with program requirements and simply includes a member who cannot or chooses not to verify immigration status. That approach conflicts with the statutory structure, which expressly provides mechanisms for prorated and preservation assistance to mixed-status families.

65. An agency acts in excess of its statutory authority when it uses delegated authority to pursue policy goals inconsistent with the statute Congress enacted. *See Kaweah Delta Health Care Dist. v. Becerra,* 123 F.4th 939, 944 (9th Cir. 2024). HUD's Rule does the same here: it uses Section 214's verification provisions to impose household-wide consequences that Congress addressed through a more tailored framework of proration, preservation assistance, and limited termination provisions.

**IV. The Rule Will Displace Eligible Children, Destabilize Families, and Increase Homelessness**

66. The Rule will terminate housing assistance for thousands of mixed-status families nationwide, including households with approximately 36,000 children who are themselves eligible for HUD assistance. RIA at 8. Those families face homelessness, housing instability, and forced family separation in communities already experiencing an acute shortage of affordable housing.

67. The Rule's harms will fall with particular force on Los Angeles, where Individual Plaintiffs reside and where Organizational Plaintiffs' members and constituents live and work. L.A. County already suffers from one of the most severe affordable housing shortages in the nation. L.A. County faces a shortage of nearly half a million homes affordable to lower-income renters, leaving many families in unaffordable and unsustainable living situations.[8] Thirty-two percent of L.A. City renters spend more than 50 percent of their monthly income on rent.[9] More than four-

---

[8] Mahin, *supra* note 3.

[9] Kenneth Baar et al., *Equitable Rent: Rent Stabilization Standards in the City of Los*

fifths of these households have incomes below 200 percent of the federal poverty threshold.[10] With a fair market rent for a two-bedroom apartment at $2,964 per month, an L.A. County household must earn $57.00 per hour—more than three times the minimum wage in the City of Los Angeles—to afford this cost without becoming rent-burdened.[11]

68. This shortage compounds an already severe homelessness crisis. The Los Angeles Homeless Services Authority's most recent point-in-time count found approximately 73,040 people experiencing homelessness in Los Angeles County. The County's homeless population has for years numbered among the largest in the nation.

69. The Rule fuels this crisis, forcing thousands of families out of subsidized housing and into a market with few, if any, alternatives they can afford. HUD asserted that the "net effect on homelessness is ambiguous," 91 Fed. Reg. at 72997, without meaningfully analyzing the predictable consequences of terminating assistance to households that cannot afford market-rate housing.

70. Confronted with scarce and unaffordable housing, Plaintiffs now face an impossible choice under the Rule. Family members cannot or will not submit documentation—because they lack eligible immigration status, because they fear interaction with immigration enforcement, or because they lack the documents required to prove eligible status. Regardless of the reason, these family members will be deemed ineligible, and their families will face either the termination of all housing assistance or forced separation.

71. Families attempting to preserve assistance for their eligible members also face barriers arising from existing household arrangements and housing-authority

---

*Angeles* 30 (Econ. Roundtable Sept. 2024).

[10] *Id.* at 30–31.

[11] HUD, *FY 2027 Schedule*, *supra* note 4, at 4; City of L.A. Off. of Wage Standards, *July 1, 2026 Minimum Wage Ordinance Wage Rate Increase* 1 (Jan. 30, 2026).

practices. In some mixed-status households, a family member who lacks HUD-eligible immigration status is designated as the head of household. POWER members have reported that HACLA staff will not permit them to change their designated head of household in anticipation of the Rule unless the existing head dies or is deported. As a result, families who might otherwise attempt to preserve assistance for eligible members have been prevented from preparing to do so. The problem is especially acute for families whose only eligible members are minor children, who cannot remain in assisted housing independently of their parents or other adult caregivers.

72. The Rule further requires PHAs and owners to notify households that they must report a household member to DHS whenever their personnel determine that the individual is present in the United States in violation of the Immigration and Nationality Act. 24 C.F.R. § 5.508(e)(2)(vi) (as amended). HUD acknowledges that the Rule imposes a new reporting obligation on Section 8 project-based owners. 91 Fed. Reg. at 72986. That reporting obligation will chill mixed-status families from seeking or maintaining housing assistance. Family members—including U.S. citizens—may fear that submitting documentation or applying for assistance will result in the referral of their loved ones to immigration authorities. HUD expressly recognizes that the verification requirement could discourage potential eligible citizens and noncitizens from applying for assistance. *Id*.

73. The housing instability caused by the Rule will in turn harm impacted children's health, development, and well-being. Formal separation will destabilize childcare, schooling, medical care, transportation, emotional support, and household finances. Even a nominal separation, in which a family member is removed from the lease but continues to provide care or stays in the home intermittently, may create additional reporting, lease-compliance, and enforcement risks. Families that are able to enter an unsubsidized housing market will face disruption of access to other basic needs, such as food, clothing, and education.

74. The consequences of housing instability heavily impact people with

disabilities. Stable housing is essential to maintaining accessible living arrangements, receiving assistance from caregivers, storing and taking medication, attending medical and behavioral-health appointments, and remaining connected to community-based services. Forced relocation, family separation, or loss of assistance will disrupt disabled persons' ability to receive care and maintain their health, thereby increasing the risk of institutionalization, hospitalization, deterioration in health, and homelessness.

75. Plaintiff M.R. faces the imminent loss of housing assistance and the separation of his family under the Rule. M.R. is a U.S. citizen who lives in public housing with his mother, father, and sister. His household receives HUD assistance as a mixed-status family, and due to his disability, M.R. depends on his parents and sister for daily support. Because M.R.'s family members do not have HUD-eligible immigration statuses and M.R. cannot live alone, they will be forced to leave their home of over twenty years.

76. Nor do Plaintiff M.R. and his family have any adequate, affordable alternative housing available to them. The affordable housing options in their community for a family of four are limited, overcrowded, and unsafe. The loss of HUD-assisted housing exposes them to homelessness or severe housing instability in a community where affordable housing is already scarce.

77. M.R. has also relied on the stability and community his current housing provides. He has grown up with the children in his public housing development and has gone to nearby schools and doctors. The Rule threatens to disrupt those longstanding community and educational ties.

78. HUD failed to meaningfully address the effect of the Rule on U.S.-citizen children and other eligible household members who currently reside in mixed-status families and who are themselves fully eligible for housing assistance. HUD acknowledged that implementation of the Rule would result in the termination of assistance for existing mixed-status households and would impose substantial

relocation and transition costs, yet it failed to meaningfully analyze the consequences of family separation, housing instability, school disruption, and loss of community ties that would predictably result from those terminations.

79. HUD also failed to adequately consider less disruptive alternatives. The RIA identified an alternative that would allow existing mixed-status families to remain under the prior rules while applying the new requirements only to future applicants. RIA at 37. The RIA recognized that "[s]uch a gradual option would fulfill the objectives of the rule and avoid the transition costs borne by mixed families, i.e., moving costs and the indirect costs associated with the housing insecurity of the mixed families whose housing assistance is terminated." *Id*. HUD rejected grand-fathering on the ground that it would delay the transfer of assistance to fully eligible families. 91 Fed. Reg. at 73023. But HUD failed to explain why accelerating that transfer outweighed the displacement and family separation that grandfathering would avoid, particularly given its own finding that the transfer would reduce the number of households served.

80. The RIA identified a second alternative that would preserve prorated assistance for mixed-status families with children, recognizing that it would mitigate the Rule's adverse effects on child development. RIA at 37. HUD rejected that alternative on the ground that Section 214 contains no exception for children. But HUD failed to reconcile that rationale with Section 214's express authorization of prorated assistance or meaningfully weigh the harms to children that the alternative would avoid.

## V. The Rule Directly Injures the Organizational Plaintiffs and Their Members

81. Both Organizational Plaintiffs suffer direct consequences from the implementation of the Rule.

82. POWER's mission is to help members of low-income communities learn how to organize around issues that matter to those communities, such as affordable

housing. POWER puts its mission to work through public-housing tenant organization, leadership development, food-pantry distributions, and tenant-navigation services. The Rule directly threatens these core activities by threatening to displace the resident members and leaders through whom POWER carries them out.

83. POWER brings this action on behalf of its members, including identified members J.B. and M.B., who would have standing to sue in their own right. J.B. is a U.S. citizen with a disability who has lived in public housing since she was one year old. Her household currently receives prorated assistance because her parents lack HUD-eligible immigration status. Under the Rule, she faces the loss of her housing assistance or separation from her parents. J.B. is an active POWER member who volunteers at food pantries, participates in meetings, provides interpretation, and helps lead organizing activities. M.B. has lived in public housing for thirteen years with her mixed-status family, which also receives prorated assistance. Because M.B. cannot establish eligible immigration status, her family faces the loss of its housing assistance or separation. Without housing assistance, the only housing her family could afford in its community is a single-room occupancy unit. The interests POWER seeks to protect, which include the housing stability and family unity of its public-housing tenant members, are germane to POWER's tenant-organizing and subsidized-housing mission. And neither the claims asserted nor the relief requested requires the participation of individual members, because Plaintiffs challenge a uniform federal rule and seek only declaratory relief, vacatur, and injunctive relief, not individualized damages. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

84. Approximately one-quarter of POWER's members live in mixed-status households receiving prorated assistance and face the loss of that assistance or forced family separation under the Rule. Many POWER members have no alternative affordable housing available to them and face homelessness under the Rule.

85. POWER's core business activities include: (1) organizing, power-

building, and leadership growth with low-income tenants of public-housing projects in Los Angeles; (2) running food-pantry distributions within public-housing sites; (3) tenant navigation through Stay Housed LA and informal tenant-navigation assistance provided by trained member leaders; (4) increasing investment in public housing to rehabilitate existing buildings and build more public housing that is tenant-run; and (5) supporting people who are unhoused with resources, rapid rehousing, and other assistance.

86. One of POWER's consistent funding sources is Stay Housed LA, which requires POWER to complete tenant-navigation work to meet its deliverables. POWER is the only Stay Housed LA tenant-navigation contractor that specializes in public housing, and it developed the program's public-housing services and presentations in collaboration with the Legal Aid Foundation of Los Angeles. POWER receives approximately $240,000 annually through its City and County contracts to provide these services, including workshops, assistance resolving disputes with management, and support navigating HACLA's grievance procedures. POWER's tenant-navigation work under Stay Housed LA is conducted with and through the public-housing residents it serves, including mixed-status member households. POWER's member leaders connect residents to its services and encourage participation in tenant-navigation workshops. Without these leaders, POWER anticipates having to curtail its services, potentially limiting them to existing members rather than the broader public-housing community. By displacing those households from the developments where POWER performs this work, the Rule will directly impair POWER's ability to meet its existing Stay Housed LA deliverables, jeopardizing funding tied to those preexisting contractual obligations.

87. The Rule also undermines POWER's ability to maintain its food pantries, one of its core business activities. These food pantries are operated by POWER members, who organize distributions, conduct outreach, and coordinate volunteers. Members who live in mixed-status households receiving prorated

assistance play essential roles in operating POWER's food pantries. POWER's food pantry at the San Fernando Gardens public housing development serves approximately 200 to 250 families each month, and POWER also operates food pantries at Mar Vista Gardens and William Mead Homes. The Rule threatens to displace key member leaders and volunteers on whom these programs depend, substantially reducing POWER's ability to maintain existing operations. The loss of these members would likely force POWER to suspend or curtail some food-pantry operations while it recruits and trains replacements. These leaders cannot readily be replaced because their roles depend on relationships, trust, and knowledge developed over years within their communities. Because the food pantries are also a principal means through which residents become involved in POWER, their disruption would further impair POWER's ability to recruit members and develop new leaders.

88. POWER also assists its members in navigating housing-related decisions and maintains preexisting organizing, power-building, and leadership-development programs in the public-housing communities where it works. POWER's trained member leaders regularly assist neighbors with housing problems, resolving many matters themselves and referring more difficult disputes to POWER's staff. Together, these informal matters number approximately two to three each month. Residents turn to these leaders because of their established relationships and knowledge of the housing developments where they live. The Rule will directly impair those activities by destabilizing and displacing the tenant members, resident leaders, and member-volunteers through whom POWER carries them out. If these leaders are displaced, POWER will lose their knowledge and relationships with other tenants, and housing problems that previously reached POWER through its member leaders may go unaddressed. The Rule will thereby impair POWER's existing ability to resolve housing disputes through informal discussions with management and HACLA's grievance procedures.

89. POWER's organizing model depends on resident leaders who live in the

public-housing communities where POWER works, participate in regular tenant meetings, conduct outreach to neighbors, operate food-pantry distributions, and help other tenants identify and respond to displacement threats. Mixed-status POWER members, including members who serve as tenant leaders and food-pantry volunteers, will lose housing assistance or be forced to separate from their families if the Rule takes effect. With only six paid staff members, POWER depends on these resident leaders to carry out its existing programs. Several of the leaders most essential to those programs live in mixed-status households directly affected by the Rule. Their displacement will not merely reduce POWER's membership; it will deprive the organization of individuals who coordinate its programs, maintain relationships with residents, recruit volunteers, and connect tenants to housing-stability services. Because these activities depend on longstanding relationships within specific developments, POWER cannot readily replace displaced leaders with staff or volunteers from outside those communities.

90. These losses will directly impair POWER's ability to carry out its established programs, including food-pantry distributions, tenant-navigation workshops, informal housing assistance, and resident leadership development. These injuries do not arise from POWER's opposition to the Rule or from resources spent to advocate against it; they are direct operational disruptions to POWER's existing programs and core business activities. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394–95 (2024) (organization may not "spend its way into standing" through advocacy expenditures, but may establish standing where a defendant's action "directly affected and interfered with [its] core business activities"); *Ariz. All. for Retired Ams. v. Mayes,* 186 F.4th 622, 631-634 (9th Cir. 2026). Setting aside the Rule would redress these injuries by preserving the housing of the members through whom POWER carries out its existing programs.

91. Union de Vecinos likewise brings this action on behalf of its members, including identified member A.H., who would have standing to sue in her own right

because her household currently receives prorated public-housing assistance as a mixed-status family and faces termination of that assistance or forced family separation under the Rule. A.H. cannot establish eligible immigration status, while another member of her household is eligible for HUD assistance. Under the Rule, A.H. faces the loss of her longtime home or separation from her family. The interests Union de Vecinos seeks to protect, which include the housing stability and family unity of its public-housing and low-income tenant members, are germane to the organization's mission, which since its founding by public-housing residents in 1996 has been to prevent the displacement of those tenants. And neither the claims asserted nor the relief requested requires the participation of individual members, because Plaintiffs challenge a uniform federal rule and seek only declaratory relief, vacatur, and injunctive relief, not individualized damages. *See Summers*, 555 U.S. at 498–99; *Hunt*, 432 U.S. at 343.

92. The Rule will likewise directly impair Union de Vecinos's core business activities. Union de Vecinos's core business activities include: (1) operating an eviction prevention program for low-income tenants of private housing in Los Angeles; (2) operating an eviction prevention program for low-income tenants of public housing projects in Los Angeles, including supporting them with HACLA's formal and informal grievance hearing procedures; (3) supporting tenant associations in public housing projects in Los Angeles; (4) holding Know-Your-Rights trainings on housing and immigration issues; and (5) operating food distributions in Boyle Heights neighborhoods. Union de Vecinos has operated its eviction-prevention program since 2004, holds Know-Your-Rights trainings at least monthly, and conducts food distributions every two weeks in four Boyle Heights neighborhoods.

93. These activities are carried out with and through Union de Vecinos's member households, including mixed-status families receiving prorated assistance. By forcing those households to separate or to lose their housing, the Rule will directly interfere with Union de Vecinos's ability to carry out these existing programs. Union

de Vecinos operates almost entirely through volunteers, including ten volunteer organizers who coordinate its neighborhood committees and a larger base of member leaders. Several of these leaders live in mixed-status households receiving prorated HUD assistance. Union de Vecinos relies on such members to serve as organizers, neighborhood leaders, and volunteers for their neighborhood committees, eviction-prevention and hearing support programs, Know-Your-Rights clinics, and food distributions that serve approximately 120 families every two weeks. At least four leaders who volunteer at Union de Vecinos's food distributions live in mixed-status households affected by the Rule. Their displacement would reduce Union de Vecinos's ability to conduct its existing food distributions and serve the families who rely on them. The loss of affected leaders would also disrupt the neighborhood committees they organize and the Know-Your-Rights clinics and follow-up assistance they provide. Because Union de Vecinos's committees depend on longstanding relationships and knowledge developed within specific communities, displaced leaders cannot readily be replaced, and rebuilding affected committees would take years. These injuries do not arise from Union de Vecinos's opposition to the Rule or from resources spent to advocate against it. Setting aside the Rule would redress these injuries by preserving the housing of the members through whom Union de Vecinos carries out its established programs.

**A. The Rule Will Disproportionately Affect Latino Families**

94. Of the approximately 80,000 people nationally living in mixed-status households affected by the Rule, 86 percent are Latino. HUD acknowledged in its Regulatory Impact Analysis that the Rule will result in fewer total households receiving assistance—not more—and proceeded knowing that the overwhelming majority of displaced families would be Latino.

95. This disparate impact will be especially acute in Los Angeles, where Plaintiffs reside. Nearly half of L.A. County's population is Hispanic or Latino, and roughly one-third is foreign-born. The Rule threatens to disproportionately displace

Latino and immigrant households from communities in Los Angeles that are already grappling with an acute affordable-housing shortage, pushing families toward homelessness or forcing them to leave neighborhoods where they work, attend school, and have built community ties.

**B. HUD's Justifications for the Rule Are Contradicted by Its Own Analysis and the Record**

96. In the Rule, HUD identifies its "most significant effect" as transferring assistance from mixed-status families to fully eligible households, 91 Fed. Reg. at 72982; maintains that the impact on responsible entities, including PHAs, would be "low," *id*. at 72990–91; and asserts that the resulting costs are "adequately offset by the reallocation of HUD funds to the intended recipients," *id*. at 72991. But, as set forth above, HUD's own analysis shows that the Rule will result in fewer households receiving assistance overall and impose substantial costs on PHAs, tenants, applicants, and other entities.

97. Regarding its rationale for abolishing longterm prorated assistance, HUD asserted in the proposed rule that proration originally "struck a balance with timely permitting assistance but providing an incentive to cooperate in timely completion." 91 Fed. Reg. at 8155. The final Rule relies on the proposed-rule preamble to justify its departure from HUD's earlier interpretation. *Id*. at 73015. But HUD said no such thing in the Prior Rule or its predecessors. As set forth in the 1995 Final Rule, prorated assistance was "consistent with the preservation of Families provisions of Section 214," which itself arose out of Congress's concern about displacement of families who, but for their immigration status, were eligible to reside in public or assisted housing. 60 Fed. Reg. 14822.

98. Additionally, the Rule eliminates the Prior Rule's definition of "other affordable housing." 24 C.F.R. § 5.518(b)(1) (as amended). In the proposed rule, HUD asserted that the definition was "not in the statute and would effectively preclude families eligible for temporary deferral from finding other affordable

housing as defined." 91 Fed. Reg. at 8161. But HUD's reliance on low tenant rent payments does not explain why families should lose a definition designed to ensure that replacement housing is actually affordable. Nor does HUD's observation that the definition was "not in the statute" explain its departure from the 1995 Final Rule, which adopted that definition to implement Section 214's family-preservation provisions. 60 Fed. Reg. 14821.

99. Regarding abolition of the "do not contend" option, HUD now asserts that an unverified family member benefits merely by living in a household receiving prorated assistance, and that Section 214 consequently forecloses that "do not contend" option. But Section 214 is silent on whether a family member may opt out of receiving HUD assistance. Nor does HUD reconcile that interpretation with its 1995 determination that the "do not contend" option advances Section 214's dual goals of limiting assistance to eligible individuals while maintaining family unity. *See* 60 Fed. Reg. 14823.

100. Regarding the Rule's increased verification requirements, including requiring proof of eligibility for all participants, the Rule fails to identify any monetary benefit that would justify the administrative costs of the increased verification process borne by PHAs and the $1.5 million to $6.4 million in costs borne by HUD-eligible individuals who presently lack sufficient documentation of their status. RIA at 33.

101. HUD likewise failed to identify evidence in the administrative record showing that the existing system was producing widespread fraud, abuse, or diversion of benefits sufficient to justify displacing thousands of existing households. While HUD emphasized its goal of ensuring that assistance is directed only to eligible individuals, it failed to adequately consider whether that objective was already being achieved through the longstanding proration regime, under which assistance is limited to eligible family members while allowing families to remain together.

102. To the contrary, HUD concluded in the 1995 Final Rule that the mixed-

status framework reduced the potential for fraud because it allowed ineligible family members to select "do not contend" rather than choose between separating their families and fabricating evidence of eligibility.

103. HUD also failed to adequately account for the challenges U.S. citizens may face in proving their own citizenship, particularly individuals over 62 who have not had to provide such evidence for decades, if ever. An estimated 3.8 million adult U.S. citizens lack documentation proving citizenship and another 17.5 million cannot readily access it.

104. HUD likewise failed to adequately account for the reliability concerns associated with the SAVE system, which cannot conclusively verify a lack of eligible immigration status and may produce erroneous results that delay or wrongfully deny benefits to eligible individuals.

**C. HUD Expressly Relies on Immigration-Enforcement Priorities**

105. In May 2019, HUD issued a proposed rule, 84 Fed. Reg. 20589, which contained changes similar to those in the Rule with respect to mixed-status families and enhanced documentation requirements. The 2019 Proposed Rule would (a) require all members of a household receiving HUD assistance who are under the age of 62 to verify their eligible immigration status and/or citizenship; and (b) prohibit individuals who were not in an "eligible immigration status" from serving as the head of household or spouse (i.e., holder of the lease).

106. The 2019 Proposed Rule cited Executive Order 13828, which directed agencies to "adopt policies to ensure that only eligible persons receive benefits and enforce all relevant laws providing that aliens who are not otherwise qualified and eligible may not receive benefits." 84 Fed. Reg. 20590. The 2019 Proposed Rule added that it was "consistent with the Administration's regulatory reform efforts," and that it was the product of HUD's comprehensive review of its regulations "to reduce unnecessary regulatory burdens, enhance the effectiveness of those regulations that are necessary, and promote principles underlying the rule of law, including

ensuring the conformity of regulations with statutory mandates."

107. In April 2021, after a change in Administration, HUD withdrew the May 2019 Proposed Rule, noting that it was inconsistent with executive orders addressing racial equity and legal immigration-system integration.

108. Regarding its change in longstanding policy concerning mixed-status households, the Rule states that the policy was changed to "bring HUD's regulations into greater alignment with the wording and purpose of Section 214 and align with the current Administration's priorities and regulatory reform efforts." 91 Fed. Reg. at 72978.

109. The Rule also expressly relies on Executive Order 14218, which directs agencies to take action "[t]o prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States." 90 Fed. Reg. at 10581. HUD expressly states that the Rule is "consistent with the Administration's priorities concerning immigration-law enforcement," including Executive Order 14159, "Protecting the American People Against Invasion," Executive Order 14165, "Securing Our Borders," and Executive Order 14287, "Protecting American Communities From Criminal Aliens." 91 Fed. Reg. at 73013. HUD also treats the possibility that displaced individuals may "leave the United States" as a local cost offset, *id.* at 73001, and attributes its low estimate of formal evictions to its prediction that "concurrent immigration-enforcement actions may prompt ineligible individuals or mixed families to vacate voluntarily," *id.* at 72997. Announcing the Proposed Rule, HUD issued a press release stating: "Illegals, Ineligibles, and Fraudsters: Pack Your Bags." The press release linked to U.S. Customs and Border Protection's website for information about how to self-deport.

110. The number of mixed-status families in assisted housing under Section 214 has already been declining independently. HUD does not explain why that trend nevertheless requires the regulatory changes imposed by the Rule.

## CAUSES OF ACTION

### COUNT ONE

### AGENCY ACTION IN EXCESS OF STATUTORY AUTHORITY

### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(C)

***All Plaintiffs Against All Defendants***

111. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

112. The APA authorizes this Court to hold unlawful and set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

113. Count One presents a threshold question: whether Congress ever conferred on HUD the power to take the challenged actions at all. *See In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1222 (9th Cir. 2019) (distinguishing claims that agency "exceeded its statutory authority" under § 706(2)(C) from claims that agency action was "not in accordance with law" under § 706(2)(A)). An agency has no power to act except as Congress has conferred it. Section 214 delegates to HUD a defined and limited role: to verify eligibility in the manner the statute prescribes and to administer prorated and preservation assistance. Congress did not delegate to HUD any power to impose time limits on proration, to convert proration into a status that terminates upon verification, or to extend documentary verification to persons whom Congress excluded from it.

114. As alleged above, Congress responded to an earlier HUD proposal that would have required every family member to submit documentation of citizenship or eligible immigration status on pain of termination of the family's housing assistance, and instead amended Section 214 to protect against family division. By imposing similar household-wide consequences, HUD exceeds the boundaries Congress placed on its delegated authority.

115. The House Report accompanying the 1987 amendments stated that "the Committee is including these changes because the Department has incorrectly

interpreted the original Act." H.R. Rep. No. 100-122(I). The Committee further stated that "families in which at least one person is eligible are not disqualified." That history further demonstrates the limits Congress placed on HUD's authority over mixed-status families.

116. HUD's longstanding implementing regulations likewise treated prorated assistance as distinct from temporary deferral and required PHAs and owners to offer prorated assistance to eligible mixed-status families. As alleged above, the Rule abandons that framework.

117. The Rule also exceeds HUD's authority by mandating that noncitizens of all ages verify their immigration status. Section 1436a(d) does not impose on noncitizens age 62 or older the documentation and immigration-status verification requirements it imposes on younger noncitizens. By extending those requirements to noncitizens of all ages, HUD exceeds the boundaries Congress set.

118. Because Congress withheld from HUD the power to do what the Rule does, the Rule is "in excess of statutory jurisdiction, authority, or limitations" under 5 U.S.C. § 706(2)(C), independent of whether the Rule's provisions also conflict with Section 214's substantive commands as alleged in Count Two.

119. Plaintiffs seek an order holding the Rule unlawful and vacating it without remand pursuant to 5 U.S.C. § 706(2)(C). *Kaweah Delta Health Care Dist.*, 123 F.4th at 953.

## COUNT TWO
## AGENCY ACTION NOT IN ACCORDANCE WITH LAW
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
***All Plaintiffs Against All Defendants***

120. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

121. The APA authorizes this Court to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

122. The "not in accordance with law" inquiry asks whether HUD's exercise

of its authority conflicts with the substantive commands of *any* applicable law—not merely the statute HUD administers. *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003). Whether agency action is "not in accordance with law" is a question of statutory interpretation, not an assessment of reasonableness. *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010).

123. The Rule is not in accordance with law because, even assuming HUD may regulate verification under Section 214, the Rule contradicts the mandatory commands Congress enacted for mixed-status families. Section 1436a(b)(2) mandates that financial assistance "*shall* be prorated" where the eligibility of at least one family member has been affirmatively established and the ineligibility of other family members has not been affirmatively established (emphasis added). By eliminating the "do not contend" provision and requiring every household member to undergo verification, the Rule seeks to create the affirmative determinations of ineligibility that HUD contends remove families from the proration provision's scope.

124. The Rule is also inconsistent with the family-preservation framework Congress enacted in Section 1436a(c). Section 1436a(c)(1)(A) expressly provides for continued prorated assistance to certain mixed-status families when necessary to avoid family division, while Section 1436a(c)(1)(B) separately authorizes temporary deferral of termination.

125. The statutory structure confirms the distinction between these forms of assistance. Congress expressly imposed an 18-month limit on temporary deferral under Section 1436a(c)(1)(B), while imposing no comparable time limit on proration under Section 1436a(b)(2) or continued assistance under Section 1436a(c)(1)(A).

126. Section 1436a(d)(6) further confirms that Congress contemplated prorated assistance to families containing known ineligible members. As alleged above, that provision expressly exempts from family-wide termination a family where "the ineligibility of the ineligible individual at issue was considered in calculating any proration of assistance provided for the family." The Rule's contrary interpretation

would deprive that statutory safe harbor of operative effect.

127. The Rule also conflicts with Section 1436a(d)'s verification requirements. For noncitizens age 62 or older, the statute does not impose the documentation and immigration-status verification requirements that it imposes on younger noncitizens. *See* 42 U.S.C. § 1436a(d)(1)–(4). The Rule's requirement that noncitizens of all ages verify their eligible immigration status conflicts with that statutory distinction.

128. Courts must exercise independent judgment about questions of statutory interpretation and review de novo whether an agency has correctly interpreted the statute it administers. *Loper Bright Enters.*, 603 U.S. at 412–13; *China Unicom (Ams.) Operations Ltd*. v. FCC, 124 F.4th 1128, 1142–43 (9th Cir. 2024). Applying the traditional tools of statutory interpretation, the Rule cannot be squared with the mandatory proration, family-preservation, and age-based verification provisions of Section 214. The Rule also fails to comply with HUD's independent obligation under 42 U.S.C. § 3608(e)(5) to administer its programs affirmatively to further fair housing, as alleged in Count Four. The Rule is therefore "not in accordance with law" under 5 U.S.C. § 706(2)(A).

129. Plaintiffs seek an order holding the Rule unlawful and setting it aside pursuant to 5 U.S.C. § 706(2)(A).

**COUNT THREE**
**ARBITRARY AND CAPRICIOUS AGENCY ACTION**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
***All Plaintiffs Against All Defendants***

130. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

131. The APA authorizes this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

132. An "agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change." *Motor Vehicle Manufacturers Ass'n of*

*the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). While an agency need not show that a new rule is better than the rule it replaced, it must demonstrate that "there are good reasons" for the replacement and that the new policy is "permissible under the statute." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy." *Id*.

133. When an agency changes a longstanding policy, it must also account for serious reliance interests created by the prior regime. Because the agency is "not writing on a blank slate," it must assess whether reliance interests exist, determine whether they are significant, and weigh them against competing policy concerns. *Regents,* 591 U.S. at 30–33.

134. HUD failed to do so here. Despite acknowledging the substantial transition and relocation costs facing existing households, HUD failed to adequately account for their longstanding reliance interests.

135. HUD also reversed positions it had maintained for decades concerning prorated assistance, family preservation, the "do not contend" option, and verification requirements without adequately explaining why the factual and policy judgments underlying those positions no longer applied.

136. An agency also acts arbitrarily and capriciously when it fails to consider an important aspect of the problem before it. *State Farm*, 463 U.S. at 43. The APA requires agencies to engage in reasoned decision-making and to consider material consequences of their actions, significant concerns raised during the rulemaking process, and reasonable alternatives bearing on the problem before them.

137. HUD failed to meaningfully consider critical consequences of the Rule for U.S.-citizen children and other eligible household members. HUD's own analysis estimates that approximately 36,000 HUD-eligible children live in affected mixed-status households. Yet HUD failed to adequately grapple with the housing instability,

school disruption, family separation, and risk of homelessness that will result when those households lose assistance.

138. HUD likewise failed to adequately consider the Rule's effects on homelessness, including the displacement of families unable to afford market-rate housing.

139. HUD also failed to adequately consider the administrative consequences of the Rule. As alleged above, HUD's own RIA predicts substantial new verification, termination, appeal, and turnover costs; estimates between $17 million and $33 million in costs to responsible entities and HUD-eligible tenants and applicants; and concludes that, absent additional appropriations, the Rule will result in fewer households receiving housing assistance.

140. Nor did HUD adequately assess whether its verification system can reliably confirm eligibility—an important aspect of the problem. *State Farm*, 463 U.S. at 43. Yet HUD failed to analyze how SAVE errors and verification delays, combined with documentation deadlines and difficulties proving citizenship, could cause eligible individuals to lose assistance. Nor did it explain why program integrity justifies a regime that predictably terminates eligible households.

141. HUD further failed to adequately consider less disruptive alternatives identified in its own RIA. HUD inadequately justified its rejection of alternatives that would grandfather existing mixed-status families or exempt families with children, despite recognizing that those alternatives would avoid transition costs and mitigate harm to children.

142. HUD has an obligation to "examine relevant data" and, based on that data, "articulate a satisfactory explanation for its action." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 992 (9th Cir. 2025). HUD's own RIA and other evidence in the record undermine several of the Rule's stated rationales, including its characterization of the Rule's effects on the number of households served, responsible entities, administrative costs, and affected mixed-status families.

143. HUD also failed to identify evidence in the administrative record showing that the existing framework was producing widespread fraud, abuse, or diversion of benefits sufficient to justify the Rule's disruption of existing households. While HUD emphasized its goal of ensuring that assistance is directed only to eligible individuals, it failed to adequately consider whether that objective was already being achieved through the longstanding proration regime.

144. An agency may not make a policy change based "on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. As alleged above, HUD expressly relied on the Administration's immigration-enforcement priorities in promulgating the Rule. But Section 214 does not authorize HUD to use its housing programs as a mechanism for enforcing or deterring violations of federal immigration law.

145. For these reasons, HUD acted in a manner that was arbitrary, capricious, and an abuse of discretion. Plaintiffs seek an order holding the Rule unlawful and setting it aside pursuant to 5 U.S.C. § 706(2)(A).

## COUNT FOUR
## AGENCY ACTION CONTRARY TO LAW
## Violation of HUD's Duty to Affirmatively Further Fair Housing, 42 U.S.C. § 3608(e)(5) and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
***All Plaintiffs Against All Defendants***

146. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

147. The Fair Housing Act requires HUD to administer its programs and activities "in a manner affirmatively to further" the policies of the Act. 42 U.S.C. § 3608(e)(5).

148. HUD's duty to affirmatively further fair housing requires HUD to consider the effects of its actions on protected groups and to administer its programs in a manner that promotes, rather than undermines, fair housing opportunities.

149. The Rule disproportionately burdens protected groups, including families with children, Latino households and other racial and ethnic minorities, and

households containing individuals with disabilities.

150. The Rule terminates or threatens housing assistance for families that include U.S.-citizen children and other individuals who are themselves eligible for housing assistance, increasing the risk of housing instability, displacement, and homelessness among protected groups.

151. Defendants failed to adequately consider the Rule's disparate effects on protected groups and failed to meaningfully evaluate whether the Rule is consistent with HUD's obligation to affirmatively further fair housing. Although HUD acknowledged "the particular hardship this rule may pose" for Latino, Black, and AAPI participants and participants with disabilities, 91 Fed. Reg. at 73011, it asserted that the Rule "has no bearing on the agency's statutory directive to affirmatively further fair housing since no person is being denied housing on the basis of a protected class." *Id.* at 73017. HUD thus dismissed its affirmative statutory obligation without undertaking the analysis Section 3608(e)(5) requires.

152. Defendants further failed to adequately evaluate whether alternatives that would achieve their stated objectives could avoid or substantially reduce the Rule's discriminatory effects on protected groups.

153. By promulgating a Rule that undermines housing opportunities for protected groups and by failing to adequately consider those effects, Defendants acted contrary to HUD's statutory obligations under 42 U.S.C. § 3608(e)(5).

154. The Rule is therefore "not in accordance with law" and must be held unlawful and set aside under 5 U.S.C. § 706(2)(A).

## COUNT FIVE
## PROCEDURAL DUE PROCESS
### Violation of the Fifth Amendment to the U.S. Constitution
***Plaintiff M.P. and Organizational Plaintiffs Against All Defendants***

155. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

156. The Fifth Amendment prohibits the Government from depriving a person

of life, liberty, or property without due process of law. U.S. Const. amend. V.

157. Existing recipients of housing assistance have a constitutionally protected property interest in benefits to which they remain entitled. *See Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1191–92 (9th Cir. 2015); *Ressler v. Pierce,* 692 F.2d 1212, 1215–16 (9th Cir. 1982). This entitlement arises from statutes and regulations that establish eligibility criteria and constrain the discretion of those administering housing assistance.

158. Although the Government may change substantive eligibility requirements for public benefits, the Due Process Clause protects recipients against erroneous deprivation resulting from individualized factual determinations under those requirements. *See Atkins v. Parker*, 472 U.S. 115, 128–30 (1985); *Greene v. Babbitt,* 64 F.3d 1266, 1273–74 (9th Cir. 1995).

159. Under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the adequacy of the Rule's procedures depends on three factors: (1) the private interest affected; (2) the risk of erroneous deprivation and the probable value of additional safeguards; and (3) the Government's interest, including the administrative and fiscal burdens of additional procedures. Compliance with regulatory procedures does not itself establish constitutional adequacy. *See Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1192 (9th Cir. 2015).

160. The private interest at stake—continued housing assistance—is substantial. Termination of public housing or Section 8 assistance can result in loss of shelter, family disruption, displacement of children from schools, and homelessness.

161. The Rule substantially expands the number of existing recipients required to establish their citizenship or eligible immigration status through government verification procedures. These procedures create a risk that households that remain substantively eligible for assistance will lose that assistance not because their members lack qualifying status, but because government records or verification

systems fail to establish that status accurately or promptly.

162. The Rule requires primary verification through SAVE. Where initial verification fails to confirm eligibility, the Rule requires secondary verification, including additional documentation or further SAVE review. 24 C.F.R. § 5.512(c)–(d) (as amended). HUD acknowledges that SAVE may require manual review and that the Rule establishes no deadline for completing secondary verification. 91 Fed. Reg. at 72987. Inaccurate, incomplete, or outdated government records may therefore prevent verification of individuals who are, in fact, eligible for assistance.

163. The Rule compounds these risks by imposing new documentation deadlines. Mixed-status families must submit initial evidence within 90 days of the Rule's effective date, with no more than 60 days of extensions. Although additional documentation may be required during verification, the Rule does not guarantee sufficient time to obtain replacement documents or correct government records before an adverse eligibility determination becomes final. These requirements particularly burden recipients who face difficulties obtaining documentation because of age, disability, or language barriers.

164. The Rule eliminates the existing DHS appeal process, which permits families to challenge an unsuccessful immigration-status verification while continuing to receive assistance. Although individuals may seek correction of the underlying government records, the Rule does not require that process to conclude before assistance terminates. 91 Fed. Reg. at 73015; 24 C.F.R. § 5.514(d)(4) (as amended).

165. The Rule retains an informal hearing and protects existing assistance while verification or the hearing remains pending. But a hearing officer cannot independently correct records maintained by another government agency, and the Rule does not require the officer to await the outcome of a pending records-correction request before issuing an adverse decision. The hearing may therefore conclude—and assistance terminate—before an eligible household can establish its qualifying status.

24 C.F.R. § 5.514(b), (c), (e) (as amended).

166. Subject to limited exceptions, the Rule requires termination of assistance when primary and secondary verification fail to establish eligibility and the family receives an adverse final hearing decision. Thus, an eligible household may lose assistance because verification or records correction remains unresolved, rather than because a household member lacks qualifying status.

167. Additional safeguards—particularly a reasonable opportunity to complete a diligently pursued government-records correction before assistance terminates—would materially reduce this risk. These safeguards would preserve HUD's eligibility requirements while allowing a limited period to resolve government-caused verification problems. Given the substantial private interest in continued housing assistance, the value of these protections outweighs their additional administrative and fiscal burdens.

168. By permitting termination of housing assistance before eligible recipients have a meaningful opportunity to resolve erroneous government records and establish their eligibility, the Rule violates Plaintiffs' procedural due process rights under the Fifth Amendment.

169. Plaintiffs seek a declaration that the Rule violates the Fifth Amendment's procedural due process guarantee and an injunction against its enforcement to the extent it permits termination of assistance without constitutionally adequate procedures.

## PRAYER FOR RELIEF

Plaintiffs pray that this Court grant the following relief:

(1) Declare that the Rule is unlawful under the Administrative Procedure Act because it is in excess of HUD's statutory authority, 5 U.S.C § 706(2)(C);

(2) Declare that the Rule is unlawful under the Administrative Procedure Act because it is not in accordance with law 5 U.S.C. § 706(2)(A);

(3) Declare that the Rule violates HUD's duty to affirmatively further fair housing under 42 U.S.C. § 3608(e)(5);

(4) Declare that the Rule violates Plaintiffs' procedural due process rights under the Fifth Amendment;

(5) Permanently vacate the Rule pursuant to 5 U.S.C. § 706(2)(C);

(6) Hold unlawful and set aside the Rule pursuant to 5 U.S.C. § 706(2)(A);

(7) Stay or postpone the effective date of the Rule, currently December 14, 2026, within the Central District of California pending judicial review pursuant to 5 U.S.C. § 705 and, upon final judgment, vacate the Rule in its entirety, thereby restoring the regulations in effect immediately before the Rule's effective date;

(8) Preliminarily and permanently enjoin Defendants, their officers, agents, employees, and all persons acting in concert with them from implementing or enforcing the Rule in the Central District of California;

(9) Award Plaintiffs reasonable attorneys' fees, costs, and other disbursements permitted by law; and

(10) Grant such other and further relief as the Court deems just and proper.

DATED: November 16, 2026 **KENDALL BRILL & KELLY LLP**

By: /s/ Richard B. Kendall
Richard B. Kendall
Attorneys for Plaintiffs

DATED: November 16, 2026 **PUBLIC COUNSEL**

By: /s/ Amanda Mangaser Savage
Amanda Mangaser Savage
Attorneys for Plaintiffs

DATED: November 16, 2026 **BIRD MARELLA LLP**

By: /s/ Alexander H. Tran
Alexander H. Tran
Attorneys for Plaintiffs

**SIGNATURE ATTESTATION**

Pursuant to Civil L.R. 5-4.3.4(a)(2), the undersigned counsel attests that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

DATED: November 16, 2026

By: /s/ Richard B. Kendall
Richard B. Kendall